## UNITED STATES BANKRUPTCY COURT
### for the
### DISTRICT OF PUERTO RICO

In re:

Prime Recycling and Waste Disposal Corp.,            Bk. No. 04-04351-MWV
                      Debtor            Chapter 11

Prime Recycling and Waste Disposal Corp.,
                    Plaintiff

v.                                                   Adv. No. 04-0218-MWV

Municipality of Lajas,
                  Defendant

## <u>MEMORANDUM OPINION</u>

This opinion is the result of a two day trial on Prime Recycling and Waste Disposal Corporation's ("Prime") amended complaint seeking $1,218,967.50 that is allegedly due under a landfill operating contract between it and the Municipality of Lajas (the "Municipality").  In preparing this opinion, the Court has reviewed all of the evidence, considered all trial testimony, and become well-versed in volume-to-weight calculations.

### <u>JURISDICTION</u>

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Resolution for Bankruptcy Cases" dated July 19, 1994 (Torruella, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

### <u>BACKGROUND</u>

Intending to rid itself of the costs of operating and administering its landfill and to better comply with Puerto Rican governmental regulations, the Municipality entered into a contract with Prime whereby Prime took over the operation and administration of the Lajas Municipal Dumpsite (the "Landfill").

Pursuant to the contract, the Municipality could dump seventy-five tons of waste daily (six days per week) at no charge.  Any excess tonnage would be billed to the Municipality at the rate of thirty dollars per ton.  If, on any given day, the Municipality dumped less than seventy-five tons, the Municipality would receive a credit applicable toward future dumping.  Excess tonnage over seventy-five tons due to natural disasters was exempt from the thirty-dollars-per-ton provision.  Also, Prime was to accept scrap metal twice monthly at no charge.  Section 7.01 of the contract sets out these pertinent provisions:

> In consideration of the commitment contracted by Contractor, it binds itself with the Municipality to:

> 1.   To receive without any charge, during the minimum useful life of the [Landfill], that further down has been estimated by agreement between the parties to be seventy-five (75) tons a day (450 tons per week).  In excess of seventy-five (75) tons per day (450 tons per week), the Municipality shall pay the amount of $30 per additional ton of Acceptable Solid Waste.

> 2.   In the event that the Municipality would not use the tonnage agreed herein, the Municipality shall accrue said economies for its use, as it would be best for its interests.  This accrued tonnage shall be calculated and added each week. . . . This tonnage so accrued, or its credit on behalf of the Municipality, could not be use [sic] in the case of a weather natural disaster or earthquake.

> 3.   To receive without any charge two days per month, with the prior coordination between the parties, scrap iron and dispose of the same without any charge to the Municipality.

(Joint Ex. 1.)  Importantly, the contract also provides that Prime could accept waste from other municipalities and keep any profit realized therefrom.  The Municipality, though, continued to own the Landfill.

Although compensation under the contract is based on weight, i.e., tonnage, the Landfill does not have a scale with which to weigh incoming trucks, and the contract is silent on how to convert volume to pounds; there are no guidelines or conversion factors.  Despite the contract's silence, Prime contends that the parties agreed during negotiations that Prime would use a conversion factor of 500 pounds per cubic yard for all waste, i.e., one cubic yard of waste = 500 pounds ("500 lb./$y^3$").  The Municipality denies this

and contends that during negotiations Prime refused to discuss conversion factors and procedures, insisting that it would install a scale to weigh incoming trucks.  Prime, though, asserts that a scale was only a "goal" and that it never promised to install a scale.  Regardless, Prime never installed a scale.

Beginning when Prime took over operation of the Landfill on August 18, 2003, Prime visually assessed the volume of waste in the garbage trucks entering the Landfill.  With an estimate of volume, Prime used the conversion factor of 500 lb./y$^3$ to determine how many tons of waste were in each truck.  Prime used 500 lb./y$^3$ regardless of the type of waste (e.g., domestic waste, construction debris, tree cuttings, etc.) and regardless of whether the waste was compacted or uncompacted.  Based on these assessments and conversions, Prime began sending monthly invoices to the Municipality because, according to Prime, the Municipality deposited more than seventy-five tons *every day* beginning August 18, 2003, the day Prime took over operation of the Landfill.  The Municipality refused to pay, objecting to Prime's use of 500 lb./y$^3$ as the conversion factor for all waste.  The Municipality preferred a scale or, alternatively, different conversion factors for different types of waste:  500 lb./y$^3$ for compacted domestic waste and 200 lb./y$^3$ for tree cuttings.[1]

In an effort to resolve the disagreement, a meeting was held October 7, 2003.  The participants included representatives of Prime, the Municipality, and Puerto Rico's Solid Waste Management Authority (referred to herein by its Spanish acronym "ADS").  The Municipality and Prime offer differing accounts of what happened at this meeting.  According to Prime, the parties agreed that Prime would use the volume-to-weight conversion factors furnished by ADS.  However, these factors were not actually presented at the meeting; ADS faxed the "Standard Volume-to-Weight Conversion Factors" (the "ADS Guidelines")  (Pl.'s Ex. C) to the parties days after the meeting.  The Municipality denies that any such agreement was reached.

---

[1] Almost all of the waste generated by the Municipality consists of these two types.  The Court's use of the term "tree cuttings" refers to all uncompacted organic waste such as tree cuttings and branches, yard waste, and shrubbery.

Prime continued using the 500 lb./y$^3$ conversion factor for all garbage through October 31, 2003. On November 1, Prime began using the following conversion factors derived from the ADS Guidelines: construction debris—1000 lb./y$^3$; tree cuttings—1250 lb./y$^3$; domestic compacted—750 lb./y$^3$; metals—1000 lb./y$^3$. These conversion factors are significantly higher than the 500 lb./y$^3$ used by Prime prior to November 1. Prime used these higher conversion factors until it rejected the contract on January 28, 2005. Despite being billed, the Municipality never paid any money to Prime. In its complaint, Prime claims that the Municipality owes Prime $1,218,967.50 pursuant to the contract.

## DISCUSSION

### A.    Intent of the Parties

The Court's starting point is the contract. As the contract is silent on converting volume to waste, Puerto Rican law requires that the Court look at the intent of the parties. Ramírez, Segal & Látimer v. Rojo Rigual, 23 P.R. Offic. Trans. 156 (P.R. 1989). "For determining said intent, one must consider the occasion, the circumstances, the persons involved, and the agreement they intended to negotiate." Id.; P.R. LAWS ANN. tit. 31, § 3472 (1930) ("In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."). The Court should also consider "the acts leading to a contract." Ramírez, Segal & Látimer v. Rojo Rigual, 23 P.R. Offic. Trans. 156. The evidence shows that in entering the contract the Municipality intended to stop operating the Landfill but continue dumping its trash essentially at no charge. During contract negotiations, the Municipality rejected Prime's proposal that the Municipality be permitted to dump fifty tons of trash per day at no charge and receive 5% of profits generated from the receipt of other towns' waste. The Municipality knew that it dumped more than fifty tons per day, and it did not want to pay to dump its trash at its own landfill. The parties agreed that the Municipality could dump seventy-five tons per day, and in exchange Prime could accept trash from other towns and entities and keep whatever profit it realized from doing so.

Dr. Graciela Ramirez, an environmental consultant to the Municipality, testified that prior to privatization the Landfill cost the Municipality $100,000 to $150,000 per year in operating expenses. Under the contract, Prime has charged the Municipality an average of approximately $75,000 *per month* for the Municipality to dump its own waste.[2]  Increasing its costs by eight or ten times certainly was not the intention of the Municipality.  As Harvey Minnigh, an environmental consultant to the Municipality, stated at trial, "We never contemplated the Municipality paying for anything."

The contract, though, does not leave Prime out in the cold.  Prime became the operator of an established landfill, and Prime could accept waste from other entities and municipalities.  Any profit realized from such activities was Prime's.  In return, Prime was obligated to accept, at no charge, seventy-five tons of waste per day from the Municipality, the owner of the Landfill.

## B.      The Parties Never Agreed on a Conversion Factor

Prior to November 1, 2003, Prime used 500 lb./y$^3$ as the conversion factor for all waste, regardless of type or whether the waste was compacted.  Although Prime's administrator, Mr. Miguel A. Blasini, testified at trial that the parties had agreed on using 500 lb./y$^3$ as the conversion factor, there is no evidence of this.  Further, no evidence has been produced that 500 lb./y$^3$ is an industry standard for all types of trash.  In fact, the evidence overwhelmingly shows that appropriate volume-to-waste conversions are different for each type of waste.  The evidence also reveals that appropriate waste conversion factors

---

[2]  Mr. Miguel A. Blasini, Prime's administrator, testified that prior to Prime taking over, the actual operating cost to the Municipality was $30,000 to $40,000 per month (an annual cost of $360,000 to $480,000).  Although this figure is higher than the $100,000 to $150,000 annual cost that Dr. Ramirez testified to, even Prime's estimation is significantly lower than the average amounts that Prime billed the Municipality each month.  In regard to the Municipality's operating cost, the Court gives more credit to the testimony of Dr. Ramirez than to that of Mr. Blasini, as Dr. Ramirez worked closely with the Municipality and was present during contract negotiations.

The following are the amounts allegedly due Prime: August 2003—$9,607.50; September 2003—$13,800; October 2003—$23,550; November 2003—$64,560; December 2003—$105,450; January 2004—$97,815; February 2004—$94,320; March 2004—$113,535; April 2004—$96,420; May 2004—$71,340; June 2004—$91,380; July 2004—$78,660; August 2004—$90,367.50; September 2004—$93,997.50; October 2004—$90,195; November 2004—$83,970.  (Pl.'s Ex. B.)

differ from region to region, even landfill to landfill.  If a conversion factor had been agreed upon during

contract negotiations, the contract would likely have included it.  Moreover, after considering the

memoranda, exhibits, and trial testimony, the Court is convinced that the reason for the contract's silence

is that during the negotiations Prime represented to the Municipality that it would install a scale, thereby

forestalling discussion of appropriate conversion methods.  The testimonies of Dr. Ramirez and Mr.

Minnigh, who were present during contract negotiations between Prime and the Municipality, were

consistent and credible in their representations that during the negotiations Prime refused to discuss

densities and conversion factors, insisting that it would install a scale.  Mr. Minnigh stated the same in his

January 27, 2004, letter to the Municipality's mayor.  (Def.'s Ex. 5.)

Prime also argues that the parties orally modified the contract at the October 7, 2003, meeting by

agreeing to use the conversion factors in the ADS Guidelines.[3]  The Court, however, agrees with the trial

testimony of the Municipality's witnesses, Dr. Ramirez and Mr. Minnigh, that, at most, the Municipality

agreed to look at and to consider the ADS Guidelines.  Several facts justify this position.  First, the ADS

Guidelines were not even at the meeting, but were faxed afterwards.  Second, the ADS Guidelines, as

introduced into evidence by Prime, are complex, consisting of nine pages of conversion factors for a

multitude of waste types.  Finally, and most significantly, the October 7 meeting arose because the

Municipality objected to the 500 lb./y$^3$ as being *too high*.  Yet, according to Prime, the Municipality

agreed to conversion factors that would greatly *increase* the fees it would pay Prime.  For these reasons, it

is inconceivable that the Municipality agreed at the meeting to use the ADS Guidelines.  At most, the

parties agreed to *consider* the ADS Guidelines once received.

**C.**     **The Municipality Owes Prime Nothing**

Even if the Municipality never *intended* to pay anything to Prime, the Municipality would be

obligated to pay Prime if the Municipality in fact dumped more than seventy-five tons of waste per day,

---

[3]  As stated above, the conversion factors that Prime plucked from the ADS Guidelines were much higher than the 500 lb./y$^3$ objected to by the Municipality.

taking into account the credits and the scrap iron provision.  Thus, the issue is whether Prime has proven by a preponderance of the evidence that the Municipality dumped in excess of seventy-five tons every day after the contract went into effect.  Having found that the parties never agreed on a conversion factor, the Court first considers whether there is an appropriate conversion factor to be applied.

Prime's non-expert witness, Mr. Moises Rivera Colon, testified that, based on his experience working at landfills, 500 lb./y$^3$ is the standard for converting cubic yards to pounds.  However, the Municipality's expert witness, Mr. Minnigh, testified that there is no industry standard, as the weight of a given cubic yard of waste depends on the type of waste.  Mr. Minnigh also testified that weight can vary from landfill to landfill, further rebutting the notion that there is an industry standard of 500 lb./y$^3$ for all waste.  The ADS Guidelines support Mr. Minnigh's testimony.  First, the ADS Guidelines provide a variety of conversion factors for various types of waste.  Second, the page entitled "Appendix D" contains the following caveat:

> It is important to note that although the weight (density) figures presented here are useful for determining rough estimates, they will not be as useful when precise measurements are required.  Differences in the way a material is handled, processed, or in the amount of moisture present can make substantial differences in the amount a particular material weighs per specified volume.  *Because of these differences, it will be important to actually sort and weigh materials in your program whenever precise measurements are needed (e.g., recycling contract agreements).*

(Pl.'s Ex. C) (emphasis added).  The weight of the evidence proves that the conversion factor of 500 lb./y$^3$ is not an appropriate calculation for all types of waste.

The Municipality contends that the appropriate conversion factors, if any factors are to be used, are 500lb./y$^3$ for compacted domestic solid waste and 200 lb./yd$^3$ for tree cuttings.[4]  To estimate the tonnage of waste brought to the Landfill and to test Prime's estimates of the amount allegedly dumped, Mr. Minnigh undertook a weight study in which he weighed trucks before and after they dumped their waste at the Landfill.  (Def.'s Ex. 6.)  The results of the study support the Municipality's favored

---

[4]  The parties focused on these types of waste because the overwhelming amount of waste generated by the Municipality is comprised of domestic solid waste and tree cuttings.

conversion factors.  Mr. Minnigh testified credibly about the study and his ability and expertise to perform such a study.  In the study, Mr. Minnigh weighed trucks in wet and dry weather, trying to weigh full trucks because the size of the truck was known, resulting in a more accurate determination of volume.  The trucks were weighed on a scale at a landfill in nearby Guanica.  According to the study, compacted domestic waste generated by the Municipality weighed 490 lb./$y^3$ and tree cuttings weighed 190 lb./$y^3$.

Even if the Court applies the conversion factors of 500 lb./$y^3$ for domestic waste and 200 lb./$y^3$ for tree cuttings to the volumes reported in the monthly invoices that Prime sent to the Municipality (Pl.'s Ex. 2), the weight of the evidence indicates that the Municipality owes Prime nothing.  Taking scrap metals into account,[5] the invoices reveal that the Municipality dumped below its average allowance of approximately 1875 tons per month (average of 25 work days per month multiplied by 75).  It is not just Prime's conversion factors that have been disputed.  The billing study (Def.'s Ex. 5) and the weight study (Def.'s Ex. 6) prepared for the Municipality by Dr. Ramirez and Mr. Minnigh, as well as their testimonies at trial, cast credible and serious doubt on the accuracy of Prime's estimations of cubic yards.[6]  The estimation of cubic yards is the starting point in the volume-to-weight conversion.  Thus, if the estimation of volume is untrustworthy, so, too, is the ensuing calculation.  The billing study and the weight study strongly indicate that the Municipality dumped less than 75 tons of waste most days.

------

[5]  Recall that the contract provided that Prime would accept scrap iron twice per month at no charge.  Although the parties never set a schedule as to when these twice-monthly events would occur, because of the contract's scrap metal provision the Court's calculations in evaluation of the monthly invoices sent by Prime exclude the "industrial scrap metals" that Prime bills for.  However, in an effort to give Prime the benefit of the doubt, the Court does include in its calculation the conversion factors and volumes used by Prime for "construction waste," "scrap cars," and "chatarra," even though the conversion factors and volumes for these materials are disputed by the Municipality.  These categories, though, comprise a small amount of the waste generated by the Municipality.

[6]  According to Mr. Blasini, a trained person inspected the vehicle and assessed how much weight it was carrying.  Knowing the size of the truck, that person would estimate how full the truck is.  Beginning November 1, 2003, when Prime began using conversion factors from the ADS Guidelines, the inspector also determined what type of waste the truck contained.

When the Court considers the conversion factors used, the ADS Guidelines, the testimony of all witnesses, the billing and weight studies, the invoices sent by Prime, and the other evidence submitted at trial, the inevitable conclusion is that Prime's billing methods involved, at the least, questionable volumes and inappropriate conversion methods and that Prime has not proven that the Municipality owes it anything.

## CONCLUSION

The Municipality owes Prime nothing under the Landfill operation contract.  This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate final judgment consistent with this opinion.

DATED this 8th day of June, 2006, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge
District of New Hampshire
Sitting by designation